# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2965

_____

Jesse LeBlanc

*Plaintiff - Appellant*

v.

Denis McDonough, in his official capacity as Secretary of the United States Department of Veterans Affairs

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: March 16, 2022
Filed: July 14, 2022

_____

Before GRASZ, STRAS, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Jesse LeBlanc, an employee of the Department of Veterans Affairs, sued Denis McDonough, Secretary of the Department of Veterans Affairs, for disability discrimination. LeBlanc alleged three violations of the Rehabilitation Act:[1] failure

---

[1]29 U.S.C. § 791, *et seq.*

to accommodate; disability discrimination; and retaliation for requesting an accommodation. The district court[2] granted summary judgment to Secretary McDonough. We affirm.

## I.

LeBlanc worked for the Department of Veterans Affairs Police Department (VAPD). Under the VAPD's "Panama Schedule," officers work either only day shifts from 8:00 a.m. to 8:00 p.m., or night shifts from 8:00 p.m. to 8:00 a.m. Every two weeks, officers switch between days and nights.

Six years after starting his job with the VAPD, LeBlanc was diagnosed with vestibular dysfunction, which causes dizziness and blurred vision. LeBlanc realized that his irregular hours were exacerbating his symptoms, and requested accommodations from the VAPD, mainly that he "work [a] schedule with a stable pattern."[3] LeBlanc clarified in an email that working exclusively day shifts was the "main accommodation" he was seeking. The VAPD temporarily let LeBlanc work days while it considered his request. LeBlanc reported that his symptoms improved during that time and that he had "never felt better."

---

[2]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

[3]His written request proposed eight accommodations:
1. A work schedule with a stable pattern.
2. Limited night shifts
3. Limited short notice schedule changes.
4. Limited overtime.
5. Limited weekend shifts.
6. Ability to call in for sick leave on short notice, if needed.
7. Ability to limit distractions, if needed.
8. Allowed mobility and not confined to a singular work station.

D. Ct. Dkt. 56-9.

A few months after LeBlanc was put on day shifts, Eric Blumke, the acting Chief of Police of the VAPD, expressed concerns about the arrangement. He told Dr. Charity Hovre, a VAPD Accommodation Coordinator, that LeBlanc's accommodation caused gaps in police coverage and required other officers to cover extra nights. The VAPD's legal team later advised Chief Blumke and Dr. Hovre to deny LeBlanc's request. The lawyers believed that giving LeBlanc exclusively day shifts would violate the VAPD's collective bargaining agreement, which dictates that "[s]cheduled off-tours shall be rotated fairly and equitably among affected employees, i.e., day/evening, day/night." They worried that LeBlanc's requested accommodations would continue to force other employees to cover his nights, potentially in breach of the collective bargaining agreement. So, the VAPD provided LeBlanc with an alternative accommodation—reassignment to another position. Chief Blumke told LeBlanc that this accommodation would meet his needs without violating the VAPD's collective bargaining agreement.

Unhappy with his reassignment, LeBlanc asked the VAPD to reconsider. He argued that he and his doctors never said that he couldn't work night shifts; rather, they said that a day shift schedule might improve his symptoms. He also offered to get notes from four doctors saying that he could work night shifts, and said that he interpreted his prior doctors' notes as conveying only that it "would be nice to have [day shifts]." The Associate Director of the Medical Center considered the relevant evidence and denied LeBlanc's request for reconsideration, concluding that reassignment to a position with stable day shifts was "appropriate and justified."

LeBlanc accepted the offer of reassignment and was hired as a transportation assistant at the VA. Around that time, he applied for jobs as a detective and as a training instructor with the VAPD. Two other people, Mason Hlady and Edward Weaver, also applied for both positions.

A panel of three then-current and former VAPD employees interviewed the applicants for the detective position. Chief Blumke was not a panelist, but retained ultimate authority over hiring. Each applicant was given a numerical score

representing his qualifications. Hlady scored the highest, with a 99; LeBlanc scored 90 and Weaver scored 74. Chief Blumke hired Hlady.

The hiring process for the training instructor position involved the same applicants, the same panelists, and the same scoring method. This time, LeBlanc scored 131, and Weaver scored 114.[4] Chief Blumke acknowledged that LeBlanc's score was "significantly higher" than Weaver's. But then Chief Blumke received some disturbing news. According to a rumor he heard "third or fourth hand," LeBlanc said during the interview process that he would flee if there were an active shooter. Chief Blumke followed up on this by emailing Nicole Hlady (the wife of candidate Mason Hlady), who said that a VA nurse had told her that LeBlanc had said that. Chief Blumke contacted the nurse, who confirmed that LeBlanc said that VAPD officers are not required to confront active shooters and that, if he were involved in such a situation, he would flee. LeBlanc denies ever saying that.

In light of these allegations, Chief Blumke held a second round of interviews for the training instructor position. Instead of the original panelists, Chief Blumke and Jeff Smith, an administrative officer, conducted the interview themselves. Chief Blumke asked questions that hinted at the underlying allegations against LeBlanc, including: "[i]f you had an employee who was found to be promoting a message that is contrary to what has been trained, how would you handle that situation?" and "[w]hat would you do if you did not agree with the training or how it was to be presented?" Ultimately, LeBlanc received a score of 49 and Weaver scored 62. Suspiciously (at least to LeBlanc), both interviewers gave identical scores across all 17 categories.

Also unlike the first round of interviews, Chief Blumke requested references for each candidate. The first reference gave a positive recommendation for Weaver but had less favorable things to say about LeBlanc, noting that attention to detail and

---

[4]While Hlady scored a 116, he was ineligible for the position because he had already been hired as a detective.

-4-

personal motivation were "not a strong suit of Officer LeBlanc," and that he "was more inclined to be independent of others, and not so much inclined to align himself with others or to promote himself as a team member." The second reference gave positive recommendations for both applicants. The third reference gave a positive recommendation for Weaver, but a less favorable one for LeBlanc, stating: "I don't believe Jesse [LeBlanc] interacts with medical staff too well from what I've observed . . . . Jesse is very concerned about his 'image' and doesn't seem to accept a team-work philosophy in the work setting." After considering these references, Chief Blumke hired Weaver.

LeBlanc sued Secretary McDonough in his official capacity, alleging that: (1) the VAPD failed to provide him a reasonable accommodation for his disability; (2) the VAPD discriminated against him on the basis of his disability when it didn't hire him as a training instructor; and (3) the VAPD's decision not to hire him was retaliation for his accommodation request. The district court granted summary judgment to Secretary McDonough on all claims. It reasoned that the VAPD provided a legitimate, non-discriminatory reason for not hiring LeBlanc—that he wasn't the best applicant based on his recommendations, second round scores, and alleged comments at the first interview. It concluded that LeBlanc had not shown that the VAPD's proffered reason was pretextual, so there was no genuine dispute of material fact sufficient to survive summary judgment. LeBlanc appeals, arguing that the district court erred by granting summary judgment on his failure to accommodate and failure to hire claims.[5]

## II.

We review the grant of summary judgment *de novo*, drawing all reasonable inferences in favor of LeBlanc. *Correia v. Jones*, 943 F.3d 845, 847 (8th Cir. 2019). "Summary judgment is only appropriate if there is no genuine dispute as to any

---

[5]He does not appeal the grant of summary judgment on his retaliation claim.

material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quotation omitted).

A.

LeBlanc first argues that the VAPD failed to reasonably accommodate his vestibular dysfunction.[6] The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability . . . be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). The VAPD therefore must provide reasonable accommodations for employees with a disability unless it "can demonstrate that the accommodation would impose an undue hardship." 29 C.F.R. § 1630.9(a).

We conclude that LeBlanc's requested accommodation was not required under the Rehabilitation Act because it would impose an undue hardship on the VAPD. His request was primarily for exemptions from the VAPD's Panama Schedule. LeBlanc asked for "[a] work schedule with a stable pattern" rather than rotating between night and day shifts. He also asked for "[l]imited night shifts," "[l]imited overtime," "[l]imited weekend shifts," and the "[a]bility to call in for sick leave on short notice, if needed." But those accommodations would have violated the VAPD's collective bargaining agreement, which requires that "[s]cheduled off-tours shall be rotated fairly and equitably among affected employees, i.e., day/evening, day/night." LeBlanc's requested accommodations are therefore presumptively unreasonable. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 394 (2002) ("[T]o show that a requested accommodation conflicts with the rules of a seniority system is ordinarily to show that the accommodation is not 'reasonable.'"); *see also Faulkner v. Douglas Cnty.*, 906 F.3d 728, 734 (8th Cir. 2018) ("[T]he ADA does not require that [employers] take action inconsistent with the contractual rights

---

[6]We assume, without deciding, that vestibular dysfunction qualifies as a disability under the Rehabilitation Act. *See* 29 U.S.C. § 705(9).

of other workers under a collective bargaining agreement." (citation omitted)).[7] Those accommodations would also require LeBlanc's colleagues to work more nights, more weekends, and more irregular hours, which is also an undue hardship. *See Rehrs v. Iams Co.*, 486 F.3d 353, 357 (8th Cir. 2007) ("[A]n accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated."). The VAPD was therefore not obligated to provide LeBlanc routine day shifts.

B.

Once the VAPD realized that it couldn't accommodate LeBlanc's request for day shifts in his current position, it reassigned him to a position with more routine hours. Reassignment is "an accommodation of last resort when [an] employee cannot be accommodated in his existing position." *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 814 (8th Cir. 2015) (quotation omitted).

LeBlanc argues that his reassignment was not reasonable for two reasons. First, he claims that day shifts were not the only form of requested relief; they were just one of many possible accommodations the VAPD could have made. But the record undermines his argument. The majority of his requests were related to scheduling, including "[a] work schedule with a stable pattern," "[l]imited night shifts," "[l]imited short notice schedule changes," "[l]imited overtime," "[l]imited weekend shifts," and the "[a]bility to call in for sick leave on short notice." The only accommodations LeBlanc requested that weren't related to day shifts were the "[a]bility to limit distractions" and that he be "[a]llowed mobility and not [be] confined to a singular work station." Indeed, LeBlanc himself admitted that "the main accommodation requested is that [he] not work the night shifts" and that he "could only work night-shifts as a 'last resort.'" LeBlanc's requests to limit

---

[7]While *Barnett* and *Faulkner* both dealt with the Americans with Disabilities Act (ADA), they are precedential in this case. *See Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) ("[D]ecisions interpreting either the ADA or the Rehabilitation Act are applicable and interchangeable to claims under each statute.").

distractions and move around were not "alternatives," but were instead subsidiary to his primary request of routine, daytime hours.

LeBlanc also suggests that his reassignment constituted an adverse employment action, not a reasonable accommodation. It's certainly true that reassignment to another position *can* constitute an adverse employment action in some circumstances. *See, e.g.*, *Kerns v. Cap. Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir. 1999) ("[C]hanges that affect an employee's future career prospects are significant enough to" qualify as an adverse employment action). But reassignment can be a reasonable accommodation "when the employee cannot be accommodated in his existing position." *Ehlers v. Univ. of Minn.*, 34 F.4th 655, 660 (8th Cir. 2022) (citation omitted). As other courts have reasoned, "[w]e have trouble imagining how a demotion that qualifies as a reasonable accommodation *required by* the [Rehabilitation Act] can, at the same time, constitute disability discrimination or retaliation *prohibited by* the [Rehabilitation Act]." *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 856 (7th Cir. 2019). The VAPD provided the only available reasonable accommodation—reassignment. The district court was therefore correct to grant summary judgment to Secretary McDonough on LeBlanc's failure to accommodate claim.

C.

LeBlanc also alleges that the VAPD failed to engage with him in an interactive process. When an employee requests an accommodation, the Rehabilitation Act requires employers to consider potential solutions by engaging in an "informal, interactive process." 29 C.F.R. § 1630.2(o)(3); *see also Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002). To show that an employer failed to engage in this process, an employee must show, in part, that "the employer did not make a good faith effort to assist the employee in seeking accommodations" and "the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id.* (citation omitted). LeBlanc fails both requirements.

First, the record is replete with evidence that the VAPD worked with LeBlanc in good faith to find an acceptable accommodation: it provided an interim accommodation, sent him numerous communications explaining the accommodation process, and engaged in a reconsideration process. Based on this record, there is no genuine dispute that the VAPD failed to engage in an informal, interactive process. In any event, LeBlanc could not "have been reasonably accommodated but for the employer's lack of good faith." *Id.* As discussed above, the only reasonable accommodation available for LeBlanc was reassignment, which he received.

III.

LeBlanc next claims that he wasn't hired for the training instructor position because of his disability. Disparate treatment claims under the Rehabilitation Act follow the familiar burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The plaintiff must first make a *prima facie* case of discrimination by establishing that (1) he has a qualifying disability, (2) "he is qualified to perform the essential functions of his position, with or without a reasonable accommodation," and (3) "he suffered an adverse action due to his disability." *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 568 (8th Cir. 2007) (citation omitted). "Once the plaintiff establishes this prima facie case, then a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action." *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014). If the defendant satisfies its burden, "the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination." *Id.*

The VAPD concedes that LeBlanc made a *prima facie* case of discrimination. But it argues that it had a legitimate, nondiscriminatory reason for not hiring him— he wasn't the best candidate for the job. While LeBlanc had the highest initial interview score for the instructor position, there were also allegations that he said he

would flee in the event of an active shooter. Based on those allegations, Chief Blumke decided to take a closer look at the applicants. He tracked down the source of the rumor, held a second round of interviews, and solicited references for both candidates. All of that information helped Weaver's application and hurt LeBlanc's. LeBlanc's second-round interview score of 49 was significantly lower than Weaver's score of 62. And two out of the three references expressed concerns about LeBlanc's candidacy, whereas Weaver received three glowing recommendations. At that point, the burden shifted back to LeBlanc to show that the VAPD's proffered reason for not hiring him—that Weaver was the better applicant—was mere pretext. He hasn't met that burden.

LeBlanc claims that the unusual nature of his hiring process proves that the real reason for his non-selection was disability discrimination. He points to the fact that there were two rounds of interviews and that Chief Blumke sat on the second interview panel, both of which are departures from the usual VAPD hiring procedure. But showing that an interview process is "unusual" is not sufficient to prove that an employer's proffered reason is pretextual. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). Viewing LeBlanc's evidence "in light of the employer's justification," *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) (citation omitted), he has failed to meet his burden. It's reasonable for an employer, after hearing troubling allegations about an applicant's professional conduct, to seek out more information.

LeBlanc also points to the fact that the second panel gave identical scores across 17 categories, and that he received a lower score in the second interview than in the first. But VAPD policy permits panelists to discuss their deliberations, and "[i]t would not be unusual for panelists to discuss what they heard from the candidates and what score they were going to assign." Given that an interviewer is allowed to "tell the other interviewing panelists about the particular concern" they have with a candidate, it's reasonable to conclude that LeBlanc's lower scores were due to worries that LeBlanc would flee an active shooter. That inference is bolstered by the fact that Chief Blumke asked questions tailored to that concern. In any event,

VAPD policy does not require that it hire the applicant with the highest interview score, so Chief Blumke was free to view LeBlanc's alleged comments about fleeing as disqualifying.

Finally, LeBlanc argues that the VAPD's minimal investigation into his alleged comments shows that it didn't believe the allegations were credible, so the VAPD's proffered reason was pretextual. For instance, he points to the fact that Chief Blumke never confronted LeBlanc with the accusation, and that the initial source of the accusation was the wife of another applicant. But we have routinely held that "shortcomings in an investigation do not by themselves support an inference of discrimination." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009). Because LeBlanc did not show a genuine dispute of material fact on pretext, the district court did not err by granting summary judgment to Secretary McDonough on his failure to hire claim.

IV.

We affirm.

_____